UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 07-20696-CIV-HOEVELER

JOSE ADEGA, as personal representative
of the ESTATE OF GUILLERMO L. POMARES,
for the use and benefit of the ESTATE OF
GUILLERMO L. POMARES and MIRNA
POMARES,

    Plaintiff,

v.

STATE FARM FIRE AND CASUALTY
INSURANCE COMPANY,

    Defendant.
_____/

## ORDER AND REASONS

BEFORE the Court are cross-motions for summary judgment. Both motions have been fully briefed and the Court heard oral arguments on September 24, 2009. The submissions orbit around a single question: Is there legally sufficient evidence for a jury to conclude that State Farm acted in bad faith towards its insured in handling Jose Adega's third-party insurance claim? The Court finds that there are material fact disputes and, accordingly, the motions for summary judgment are DENIED.

### Background

On October 13, 2003, Heldelberto Llerena ("Llerena") was driving his personal pick-up truck eastbound on SW 8th Street in Miami on an errand for his employer, Naroca Construction Company ("Naroca"). Tragically, Llerena ran a red light and killed a

pedestrian in the crosswalk, Guillermo Pomares. At the time of the accident, Llerena's truck was insured by State Farm with $10,000 in personal liability coverage.

On November 7, 2003, Jose Adega, the decedent's step brother, hired attorney Ronald Rodman to seek insurance benefits on behalf of the Pomares family. Mr. Rodman wrote a letter to State Farm's Miami office on November 11, 2003 demanding payment of Llerena's policy limits. In the letter, Rodman asked State Farm to disclose other known insurance that might apply and details about Llerena's employer. Rodman enclosed a copy of the police report, a death certificate, and a financial affidavit to be executed by Llerena. State Farm received Rodman's demand on November 12 (a copy from State Farm's files is stamped "RCV'D 11/12/03 DADE"), but submits that, for unknown reasons, the documents never reached the claims department. On December 4, 2003, Rodman re-sent the letter, which State Farm received the next day. State Farm assigned claims representative Roberto Bolivar to the case, who, by letter of December 5, 2003, offered to tender policy limits upon State Farm's receipt of, (1) a copy of the death certificate, (2) a court order appointing a personal representative of the Pomares estate, and (3) a release executed by the personal representative (though the release was not provided). Mr. Bolivar's letter also indicated that State Farm would require a hold harmless agreement and information about medical liens before any settlement could be completed. That same day, Mr. Bolivar sent two letters to Heldelberto Llerena. The

first one advised Llerena about the claim and the possibility of an excess judgment; the second asked Llerena to execute a financial affidavit (which was enclosed) and return it to Mr. Rodman's office.[1]

According to State Farm's claim log, on December 5, 2003 Bolivar conferred with Naroca Construction's claims representative, who said that Llerena was "running an errand for [Naroca] when the accident happened" and that "a claim under their general liability policy has been set up." Three days later, Bolivar responded to Mr. Rodman's request for insurance disclosure. On the disclosure form, Bolivar listed Llerena as the only insured under the policy and represented that State Farm was unaware of potential coverage other than the $10,000, even though Bolivar apparently already knew about potential coverage under Naroca's $500,000 personal liability policy with Royal & Sun Alliance Insurance ("Royal & Sun").

Over the next month, Rodman was waiting for Llerena's financial affidavit and the $10,000 check, and State Farm was apparently waiting for a court order appointing a representative of the estate. On January 6, 2004, State Farm inquired about the court order, and Rodman did not respond. On March 24, 2004, about a month after Adega filed the wrongful death lawsuit in state court against Llerena and Naroca Construction, State Farm amended its insurance

---

[1] Adega contends that these English-language correspondences were ineffective because Llerena, an 80-year old Hispanic man, does not read English. The affidavit was not executed.

3

disclosure, notifying Rodman for the first time that the company learned of "an excess policy [that may be] available through Heldelberto Llerena's employer." State Farm apologized for its prior omission and provided details about Naroca's $500,000 Royal & Sun personal injury policy. The amended disclosure did not revise State Farm's earlier position that the only insured under the State Farm policy was Llerena.[2]

On May 12, 2004, State Farm sent the first of two settlement communications central to the plaintiff's bad faith allegations:

> [I]t would appear that a personal representative [for the Estate] has been appointed. At this time, we are again tendering our policy limits on behalf of Heldelberto Llerena and Naroca Construction Co. Enclosed is our draft in the amount of $10,000 and a release. Although we have forwarded and requested the return of the financial affidavit, we have not received this from Mr. Llerena. We will, again, follow up with him on this information.

Although Naroca carried a separate $500,000 liability policy and

---

[2] Although both sides agree that Naroca is an additional insured, there are factual disputes about when this was established. Under the "Who Is Insured" section of the policy, "insured means: (1) you; . . . (5) any other person or organization liable for the use of such a car by [you]." In four separate insurance disclosures between December 2003 and September 2004 (two to Mr. Rodman, one to Royal & Sun's lawyer, and one to Llerena's lawyer) State Farm wrote: "The name of each insured: Heldelberto Llerena." There is no evidence of record that State Farm offered to defend Naroca in the wrongful death suit, or made the communications that are customary in an insurer-insured relationship. In February 2008, Mr. Rodman testified at his deposition "I don't believe [Class 5] applies to Naroca, because I think it would [contradict other language] that excludes employers." On the other hand, State Farm clearly viewed Naroca as an additional insured. See 2/15/05 letter from Cox to Llerena (the $10,000 settlement offer "included your employer, Naroca Construction, as it is our opinion they are an insured as defined under your policy.").

had not been disclosed as an additional insured under the State Farm policy, State Farm sought Adega to "release and forever discharge: Heldelberto Llerena, Naroca Construction Company, and Naroca Construction Company I" for payment of $10,000. Rodman returned the check and informed State Farm "[w]e believe your actions in this matter are clearly contrary to your insured's best interest and are tantamount to bad faith handling of this claim." Rodman did not explain his position further or request a special release. On October 26, 2004, State Farm reiterated its offer in a pre-suit proposal "for a complete settlement of all of Plaintiffs' claims which were, or could have been, brought in the above captioned cause [Adega v. Naroca Construction Co., et al.]," offering $10,000 for Adega to execute a "the standard release and hold harmless agreement" (which was not provided).³ Rodman advised his client that the settlement was unreasonable.

---

³ The quoted language suggests that the October 26 proposal for settlement ("PFS") proposed payment of $10,000 for release of both defendants. Other language supports State Farm's contention the PFS was for the release of only Llerena. If true, this would undermine the plaintiff's bad faith allegations. The proposal is poorly drafted. The Court points out, however, that on February 1, 2005, months after the PFS, State Farm advised Llerena that a PFS was "sent to the plaintiff for $10,000 on your behalf"; two weeks later, State Farm wrote him again: "Our offer to settle the claims included your employer, Naroca Construction." Further, in a July 26, 2005 communication from State Farm counsel to Robert Coulombe (the lawyer hired to defend Llerena in the wrongful death lawsuit), State Farm instructs Coulombe to offer Adega policy limits without obtaining a release of Naroca upon confirmation Naroca is dismissed from the lawsuit, suggesting that the PFS from almost a year earlier did not contemplate a release of Llerena without Naroca. In any case, this is a fact issue.

5

On March 3, 2005, Royal & Sun paid Adega $500,000 for a special release of Naroca only. On November 3, 2006, Adega agreed to settle his remaining claim against Llerena for $500,000. On December 14, 2006, the state court for Florida's Eleventh Judicial Circuit Court entered a final judgment against Llerena and in favor of Adega for $500,000. Under the consent agreement, Llerena assigned to Adega the right to sue State Farm for bad faith, and Adega promised not to execute the $500,000 judgment until the bad faith case concluded. See Higgs v. Indus. Fire & Cas. Ins. Co., 501 So.2d 644 (Fla. 3d DCA 1986) (insured may assign to third party the right to pursue insured's bad faith claim against insurer). This lawsuit inevitably followed. Jurisdiction is based on the diversity of the parties and the amount in controversy under 28 U.S.C. § 1332. Adega contends that State Farm breached its duty of good faith to Llerena by taking stubborn and unnecessary settlement positions and failing to resolve the case within policy limits for Llerena only, resulting in an excess judgment against Llerena.

I.

Rule 56 instructs that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the non-moving party fails to prove an essential element of its case

6

for which it has the burden of proof at trial, summary judgment is warranted. Id. at 323. That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986) (internal quotation omitted). In making this assessment, the Court must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in favor of the nonmovant. See Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997). When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant. See Coffin v. Brandau, 2008 WL 2950117, *1 (M.D. Fla. 2008).

II.

Under Florida law, if an insurer exposes its insured to personal liability in excess of policy limits as a result of the insurer's failure to exercise good faith in the defense or settlement of the claim, the insurer may be liable for the entire judgment against the insured. The Florida Supreme Court has explained that the duty of good faith exists because, "[t]he insurance contract requires that the insured surrender to the insurance company control over whether the claim is settled."

Berges v. Infinity Ins., 896 So.2d 665, 682 (Fla. 2005). "In exchange for this relinquishment of control over settlement and the conduct of the litigation," the Berges court wrote, "the insurer obligates itself to act in good faith in the investigation, handling, and settling of claims brought against the insured." Id. at 682-83. The standard to be applied in bad faith litigation was set forth in Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783, 785 (Fla. 1980) (citations omitted):

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. . . . This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

When liability is clear and injuries are so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations. See Shin Crest PTE, Ltd. v. AIU Ins. Co., 605 F. Supp.2d 1234, 1241 (M.D. Fla. 2009), citing Powell v. Prudential Property & Cas. Ins. Co., 584 So.2d 12, 14-15 (Fla. 3d DCA 1991). In cases where there are two insureds, although the insurer has a duty of good faith towards both, there is no *per se* rule that prevents the insurer from expending policy limits to settle with one insured even if doing so

8

potentially exposes the other one to a personal liability. Id.; Contreras v. U.S. Security Ins. Co., 927 So.2d 16, 20-22 (Fla. 4th DCA 2006). Similarly, an insurer that exhausts policy limits settling with one insured may decline to defend another insured if the insurance policy includes language similar to the disclaimer in Llerena's State Farm policy, which provides: "We will not defend any suit after we have paid the applicable limit of our liability for the accident which is the basis of the lawsuit." See e.g., Contreras, 927 So.2d at 21; Underwriters Guar. Ins. Co. v. Nationwide Mut. Fire Ins. Co., 578 So. 2d, 34, 35-36 (Fla. 4th DCA 1991), citing Bohn v. Sentry Ins. Co., 681 F. Supp. 357, 365 (E.D. La. 1988), affirmed, 868 F.2d 1269 (5th Cir. 1989) (insurer not obligated to defend additional insured after good faith payment of policy limits for named insured, even though additional insured was not released). The good faith duty discussed in Boston Old Colony has been reaffirmed many times and has become part of Florida's insurance law culture.

### III.

The thrust of Adega's bad faith claim is that State Farm should have tried to obtain a release for Llerena, only.[4] Although

---

[4] In resolving the summary judgment motions, the Court does not focus on State Farm's (1) failure to respond to Adega's first demand letter; (2) request for a court order appointing a personal representative; (3) intent to contest Llerena's liability after settlement failed; or (4) the plaintiff's miscellaneous allegations regarding State Farm's inadequate communications with Llerena. Without more, these circumstances do not equate with bad faith under the facts of this case.

State Farm insists it had an obligation to obtain a global release, this view of defending multiple insureds is not rooted in Florida's bad faith jurisprudence. The fact setting of the Adega case is similar to that in <u>Contreras v. U.S. Security Ins. Co.</u>, 927 So.2d 16, 20-22 (Fla. 4th DCA 2006), in which driver Dale hit and killed a pedestrian while drunk driving a car owned by Dessanti. The car was insured under a $10,000 liability policy from U.S. Security, and Dale was an additional insured under the omnibus clause. <u>Id</u>. at 15. U.S. Security tendered policy limits to Contreras (the decedent's mother) to settle all claims. Contreras counter-offered to accept policy limits in exchange for a release of Dessanti and U.S. Security, but not Dale. U.S. Security responded that it "cannot enter into a release which operates to fully exonerate one insured while not releasing the second insured." <u>Id</u>. at 19. A wrongful death lawsuit ensued, in which Contreras won excess damages against both insureds. After trial, Dessanti assigned her bad faith insurance claim to Contreras, who in turn alleged that U.S. Security exercised bad faith in conditioning payment of insurance benefits on the release of both defendants. On appeal from the trial court's directed verdict in favor of the insurer, the appellate court reversed:

> Clearly, U.S. Security did have an obligation to act in good faith towards both of the insureds. In an effort to fulfill its obligation of good faith, U.S. Security attempted to secure, in exchange for the policy limits, a release for both Dessanti and Dale. Because of the gravity of Dale's misconduct, Contreras was not willing to settle the claim against Dale. Having attempted to

10

secure a release for Dale without success, U.S. Security fulfilled its obligation of good faith towards Dale. Once it became clear that Contreras was unwilling to settle with Dale and give him a complete release, U.S. Security had no further opportunity to give fair consideration to a reasonable settlement offer for Dale. Since U.S. Security could not force Contreras to settle and release Dale, it did all it could do to avoid excess exposure to Dale.

Having fulfilled its obligation to Dale, U.S. Security thereafter was obligated to take the necessary steps before Contreras's offer expired to protect Dessanti from what was certain to be a judgment far in excess of her policy limits. Under the terms of its policy, had U.S. Security paid out its limits, its duty to settle or defend would have ceased. Id. at 20-21.

Fifty years earlier, the Fifth Circuit considered a similar controversy about an insurer's duty to defend multiple insureds under Florida law. In Springer v. Citizens Casualty Co. of New York, 246 F.2d 123, 124 (5th Cir. 1957), Morris was hit and injured by a rental car owned by Springer (the named insured under a $5,000 Citizens liability policy), but driven by Knowles (the omnibus insured). Citizens failed to settle Morris's personal injury claim within policy limits and Morris sued both insureds in Florida court, winning damages in excess of policy limits. Id. Springer then sued Citizens for bad faith in district court for the Southern District of Florida. At trial, Judge Chote granted Citizens' motion for a directed verdict after the plaintiff rested her case. The Fifth Circuit disagreed with the ruling, because the evidence of bad faith should have been submitted to the jury. Id. at 125. The panel faulted Citizens for failing to accept Morris's pre-suit demand for policy limits in exchange for a release of only

11

Springer. Citizens had explained its refusal to release only Springer in a letter to Springer's lawyer:

> The policy which covered the automobile in the accident, gave to the operator [Knowles] rights as an additional insured. Such rights cover him to the limit of the policy coequally with Springer Motor Company, and in addition require [Citizens] to give him a defense of the law suit, if called upon to do so. Hence the company is not in a position legally or ethically to consider the proposition made by [Morris].

Id. at 128 n. 14. But the Fifth Circuit discredited this dogmatic position, because Citizens could have released only the named insured:

> [T]he record contains no hint that Knowles had ever called upon the insurer to defend him in the Morris suit or had expected any such assistance from it. The evidence, on the other hand, makes it clear that Knowles had protection with another insurance company and that he was represented in the Morris suit by an attorney employed by the other company.
>
> Moreover, any liability the insurer might have had with respect to Knowles grew solely out of the omnibus clause of its policy with insured, while its obligation to defend insured was imposed by explicit language in the insurance contract itself. The insurer could in no event be called upon to pay more than $5,000 in discharge of its entire liability under the policy. The jury would have been justified in doubting the good faith of insurer's solicitude for Knowles under the terms of the policy and the facts in evidence. Id. (footnote omitted).

The Springer analysis is instructive and the holding is echoed in contemporary decisions. See, e.g., Contreras, 927 So.2d at 20-21; Shin Crest PTE, Ltd., 605 F. Supp.2d at 1241.

Unlike the vocal claimants' attorneys in Contreras and Springer, who specifically objected to releasing both insureds and proposed partial releases, Adega's lawyer rejected State Farm's

settlement proposals without much explanation. Ordinarily, this would seriously weaken if not foreclose a subsequent bad faith case premised on the insurer's failure to enter a partial release. This is because the insurer must begin by seeking to protect both insureds. It is the claimant's refusal to enter a global release that triggers the insurer's duty to reevaluate its approach to the defense, considering such factors as the potential liabilities involved, the existence of separate or excess coverages, whether one insured has sought a defense from different insurer, and the real-world impact on litigation and settlement of releasing just one. In this case, the Court is satisfied there are material fact issues as to whether a detailed rejection or counter-proposal from Adega's lawyer was necessary. First, State Farm had made missteps in failing to disclose material coverage information. Further, Naroca was insured under a liability policy 50 times larger than Llerena's policy and, so far as it appears, never asked State Farm for a defense. By any assessment, there was substantial evidence that Llerena was negligent and that his personal liability would be in excess of $1 million if the case went to a jury.[5] There was

---

[5] Although Llerena claimed he did not run the light, no witnesses could confirm his account; one witness testified the light was definitely red in the westbound lane (which, based on light-sequencing evidence from Miami Dade County, meant the light would have been red in Llerena's eastbound lane, too); the plaintiff's expert concluded the light was red, while the defense expert was uncertain; the police were investigating the accident as a manslaughter; Llerena was involved in a similar accident only months earlier, according to State Farm's investigation. Even by State Farm's more favorable estimate, Llerena's liability was

little doubt Royal & Sun, which was handling Naroca's defense, would offer some or all of Naroca's $500,000 policy limits before trial. It was in this context Rodman rejected the global release. Whether State Farm later offered to release Llerena only (in October 2004 or any other time), and whether State Farm's duty of good faith required such an offer, are disputed. Viewing all the evidence, the Court finds triable issues about whether State Farm's solicitude for Naroca unnecessarily prejudiced Mr. Llerena's chance of avoiding excess judgement.[6] Because judgment under Rule 56 is wholly inappropriate on the present record, it is hereby

**ORDERED AND ADJUDGED:** State Farm's motion [DE 110] for summary judgment is DENIED and Adega's cross-motion [DE 165] for summary judgment is DENIED.

**DONE AND ORDERED** in Miami, Florida, October 15, 2009.

WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

cc: All counsel of record

---

between 80 and 100 percent, conservatively. Further, by all accounts the Pomares family's damages were real and substantial.

[6] The Court notes that even two weeks before Royal & Sun secured Naroca's release, State Farm still had not determined if Llerena was an additional insured under Naroca's Royal & Sun policy. See 2/15/05 letter from Cox to Llerena ("[w]hile there may be additional coverage available through your employer, we have not been provided any documentation to support whether you are an insured under their policy."). In court submissions, State Farm's counsel suggests that Llerena was, in fact, an additional insured. See State Farm's Reply Brief, DE 170, p. 6-7.

14